UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:22-cr-676 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| JEREMY BOHANNON, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |
| | ) | |

Before the Court is Defendant Jeremy Bohannon's Motion to Suppress "the controlled substances and firearms found . . . as a direct result of an unlawful traffic stop." (Doc. No. 17.) The government filed a response in opposition. (Doc. No. 19.) On April 12, 2023, the Court held an evidentiary hearing on the motion. For the reasons discussed below, Defendant's Motion to Suppress is DENIED.

**I.  Factual Findings**

On October 4, 2022, Brian Akers and Joshua Roberts, both officers with the Lorain Police Department ("LPD"), were patrolling near West 18th and Broadway. Together in an unmarked car, they saw a red sedan followed by a gray Pontiac sedan going southbound on Broadway. The officers could not discern if the cars were traveling together or if the gray Pontiac sedan was chasing the other. Both cars appeared to be in excess of the speed limit. Unlike the red sedan, the gray Pontiac sedan appeared to have overly tinted windows. The

intersection light was red for southbound traffic. The officers saw the gray Pontiac sedan make a right-hand turn at the intersection without coming to a complete stop at the red light.[1]

A traffic stop was initiated. The driver stopped in the middle of the road. (Gov't Ex. 1, Body Camera Footage of Off. Roberts, 5:26:15.)[2] Officer Roberts approached on the passenger side of the vehicle. At Officer Roberts' direction, the driver lowered the rear passenger window. (*Id*. at 5:26:25.) Officer Roberts instructed the driver to pull into a driveway and out of the street (*Id*. at 5:26:35.) The driver complied. The driver was not visible through the side windows. (*Id*.) Once in the driveway, Officer Roberts told the driver that he was stopped for excessive window tint and failing to stop before turning right on red. (*Id*. at 5:27:06.) The driver responded as follows:

> I was following her. Yeah, I'm sorry . . . . Because I didn't know where she was going. So, and she had to pick up her son by 5:30, so she was kind of in a hurry, and I was following her. I noticed I did a stop, and I did kind of a little rolling stop. I apologize about that.

(*Id*. at 5:27:14.)

Officer Roberts asked the driver for his license, to which the driver responded that he had an identification and privileges. (*Id*. at 5:27:34.) As the driver moved to comply, Officer Roberts asked, "Is there a gun or anything in here that I gotta worry about?" (*Id*. at 5:27:40.) The driver responded, "No, sir." The driver presented his dentification and an envelope purporting to

---

[1] These facts were established during the evidentiary hearing, but they are also stated in Defendant's Exhibits D (the LPD Field Case Report authored by Officer Akers) and E (the LPD Filed Case Supplement authored by Officer Roberts).

[2] The time on Officer Roberts' body camera footage is off by approximately one hour. At the evidentiary hearing, Officer Akers testified that the encounter began during the 5 o'clock hour, which is the hour reflected on Officer Acker's body cam footage, and that footage times may not match. To avoid confusion, the Court has added one hour to any citations to Government Exhibit 1.

contain documentation of driving privileges.  The driver was identified as Jeremy Bohannon.  Officer Roberts called the information in to dispatch.  (*Id*. at 5:28:17.)

While Officer Roberts was inquiring about firearms and requesting Defendant's identification, Officer Akers walked up the driver's side of Defendant's car.  (Gov't Ex. 2, Body Camera Footage of Officer Akers, 5:27:00.)  Officer Akers' body camera captured him attempting to peer into the vehicle.  After the driver lowered his window, Officer Akers explained he needed to test the window's tint level.  (*Id*. at 5:28:17.)  After the first meter reading, Officer Akers asked, "Is it that dark?"  (*Id*. at 5:28:30.)  He tested again.

Officer Akers testified at the evidentiary hearing that the meter result was "double zero."  Window tint cannot be less than 50 percent.  Officer Akers had conducted approximately 100 window tint investigations up to that day.  No other test resulted in a reading so low.  Officer Akers gave Defendant "the benefit of the doubt" and sought separate equipment for another test.

As the other meter was retrieved, dispatch advised that Defendant's license was suspended.  (*Id*. at 5:28:53.)  Officer Akers ordered Defendant out of the car for this reason.  Officer Sayers used the other meter, which he announced read four percent.  (*Id.* at 5:30:00.)  As Bohannon got out and stood next to the open driver's door, Officer Akers asked Defendant if he had any guns.  (*Id*. at 5:30:04.)  Defendant claimed a gun in his pocket.  Defendant was handcuffed, and the firearm was recovered.  Officer Akers asked Defendant why he denied having a gun when Officer Roberts had just asked about guns.  (*Id*. at 5:30:16.)  Defendant did not respond.  While searching Defendant, Officer Akers found loose pills in separate plastic bags.  (*Id*. at 5:31:19.)  Defendant said they were his medicine.

Officer Roberts had Defendant stand in front of their unmarked car, which was parked just behind Defendant's car.  Officer Akers read Defendant his *Miranda* rights.  (*Id*. at 5:31:50.)

Defendant acknowledged his rights and agreed to answer questions.  (*Id*. at 5:32:30.)  When asked why he was not truthful with Officer Roberts about his gun, Defendant said, "I don't know, actually."  (*Id*. at 5:32:54.)   He further denied knowing who owned the gun or how he came to possess it.  (*Id*. at 5:34:23.)  When asked about the pills, Defendant said that they were "ibuprofen."  (*Id*. at 5:33:33.)  When challenged with the observation that there were two different types of pills, Defendant said that they were both ibuprofen.  (*Id*. at 5:33:39.)

Officer Akers' body camera captured Officer Sayers inspecting the pills and announcing: "The blue ones are oxys."  (*Id*. at 5:34:53.)

The officers then began a search of the vehicle for evidence related to the firearm and the narcotics.  Officer Akers explained their reason for searching after learning about the pills in particular was because Bohannon misrepresented them as ibuprofen; they were not in a prescription bottle with a label; and they were loosely bagged Schedule II controlled substances.

Officer Akers testified that the vehicle was in a private driveway and needed to be towed pursuant to LPD's written procedures.  He further testified that officers complied with those procedures in full.  A tow was called, and an inventory search was conducted.

II.     **Analysis**

   A.  **The Traffic Stop**

The Fourth Amendment guards against unreasonable seizures.  *Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 528 (1967).  "An ordinary traffic stop by a police officer is a 'seizure' within the Fourth [and Fourteenth] Amendments[s]."  *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (alteration in original).  A lawful traffic stop occurs when an officer has probable cause to believe that a civil traffic violation has occurred or reasonably suspects an ongoing crime.  *Id.*; *see also United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) ("[T]here

is nothing unreasonable about stopping a vehicle whose driver has just committed a traffic violation." (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).  Lawfulness hinges on whether the officer had probable cause or reasonable suspicion of a violation, not whether the violation in fact occurred.  *See United States v. Sanford*, 476 F.3d 391, 395-96 (6th Cir. 2007).

"Probable cause is generally defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc).  "The probable cause doctrine 'is a flexible, commonsense standard [that] requires that the facts available to the officer would warrant a man of reasonable caution' to believe that a crime is afoot."  *Id*. (quoting *Ferguson*, 8 F.3d at 392)).  In analyzing probable cause, courts must "examine the totality of the circumstances from the perspective of the officer at the time of the incident."  *Id*.

The fact that a traffic violation is not an arrestable offense does not divest the police of authority to stop the vehicle to issue a citation or conduct an investigation.  *E.g.*, *Street*, 614 F.3d at 232 (upholding the legality of a traffic stop made for a seatbelt violation); *United States v. Anderson*, 458 F. App'x 440, 442 (6th Cir. 2012) (holding that a license-plate violation provided probable cause to make a traffic stop); *Whren*, 517 U.S. at 819 (driver's failure to use a turn signal provided probable cause to justify a traffic stop); *United States v. Davis*, No. 2:22-CR-195, 2023 WL 2154688, at *4 (S.D. Ohio Feb. 22, 2023) (failure to stop at stop bar, a violation of O.R.C. 4511.13, provided probable cause to conduct a traffic stop).

Both officers testified that Defendant failed to stop before turning right on red. Defendant acknowledged as much when he first spoke to Officer Roberts.  After hearing the officers' testimony and considering Defendant's statements to the officers that day, the Court

credits the officers' testimony that they saw Defendant turn right on red without first coming to a complete stop. Ohio law clearly mandates a stop before a right-hand turn on red. *See* Ohio Rev. Code § 4511.13(C)(1)(b) ("[V]ehicular traffic facing a steady circular signal indication is permitted, *after stopping*, to enter the intersection to turn right . . . ." (emphasis added)). Both officers recognized Defendant's rolling right turn was a violation of this law. The officers had probable cause to conduct a traffic stop.

But the stop was not predicated on this violation alone. The officers also observed that Defendant's front windows appeared to be excessively tinted. The Sixth Circuit has recognized "in the context of 'ongoing' traffic violations," overly tinted windows expressly included, that "the less demanding 'reasonable suspicion' standard applies." *United States v. Shelton*, 817 F. App'x 217, 219 (6th Cir. 2020); *see also United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008). An officer's suspicions are reasonable if the officer is familiar with the legal parameters for window tinting and can estimate that the vehicle is tinted substantially darker than what is permitted. *Shelton*, 817 F. App'x at 219; *United States v. Shank*, 543 F.3d 309, 311-13 (6th Cir. 2008) (affirming denial of motion to suppress because the officers reasonably suspected the defendant's window were "illegally dark based on their substantial prior experience enforcing this traffic regulation").

Officer Akers testified to serving as a law enforcement officer for approximately eight years. He estimated conducting 100 traffic stops for suspected window tint violations. Officer Akers' experience led him to this observation: if he cannot make out the driver's characteristics, then the window tint is likely illegal. Both officers testified that they could not discern any of the driver's characteristics. Their body camera footage corroborates their testimony. Even when

the car was stopped and the officers' cameras were next to the windows, the driver cannot be seen until a window was lowered.

Defendant did not dispute the excessive tint on his windows. And although not included in his motion, he suggested at argument that the window tint investigation was unconstitutionally prolonged. The lawful duration of a traffic stop is "tightly tethered to the mission of the traffic stop." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). "'Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed;' whichever comes first." *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 354).

Officer Akers approached Defendant's vehicle to begin testing the window tint at the same time Officer Roberts was asking for Defendant's license. The initial test resulted in a meter reading of "double zeros." Because a double zero result was something Officer Akers had not seen in the approximately 100 window tint investigations he had conducted, he reasonably determined that continued investigation was necessary. Another window tint meter was retrieved by Officer Sayers. While the meter was retrieved and before it was used to test the passenger side window, Officer Akers heard dispatch report that Defendant's license was suspended. Officer Akers instructed Defendant to get out of the vehicle and then asked the routine firearm question. Despite having denied any firearm previously, Defendant acknowledged a gun in his pocket. At this point, the traffic stop elevated to an arrest for improper handling.

Defendant also argued that the traffic stop violated his Fourth Amendment rights because it was premised on racial profiling. The United States Supreme Court has "foreclose[d] any argument that the constitutional reasonableness of a traffic stop depends on the actual

motivations of the individual officers involved." *Whren*, 517 U.S. at 813.³ When there is an objectively reasonable basis to conduct a traffic stop, courts may not delve into other possible motivations for the stop, including racial profiling.⁴

### B. Defendant is Ordered Out of the Vehicle

Officer Akers directed Defendant to get out of the car after hearing dispatch advise that Defendant's license was suspended. Officers can direct a driver to get out of a vehicle during a traffic stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1983); *Maryland v. Wilson*, 519 U.S. 408, 411 (1997). Here, Officer Akers explained that the directive was given because Defendant could not lawfully drive the car.

Defendant disputed this action because he claimed to have court-authorized driving privileges. He directed Officer Akers to documents previously handed to Officer Roberts. Although Officer Roberts never removed the letter from the envelope, his body camera captured him looking at a portion of the folded document with the words "PRIVILEGES GRANTED" visible and highlighted in yellow.⁵ Notwithstanding, dispatch was clear: "Bohannon is suspended." Officer Roberts credibly testified that, based on his two years of experience with LPD, dispatch has the most up-to-date information relative to suspensions and driving privileges. Dispatch would alert to privileges if the driver had privileges. No such alert was given. But

---

³ The Supreme Court's decision in *Whren* did not foreclose racial profiling claims in the context a Fourteenth Amendment Equal Protection Clause claim. 517 U.S. at 813.

⁴ Notwithstanding, the Court credits the officers' testimony, corroborated by their body camera footage, that the excessive window tinting prevented them from observing the driver's physical characteristics.

⁵ Neither party provided the Court with a copy of either this document or any separate documentation supporting Defendant's contention that he did, in fact, have driving privileges that would have allowed him to be driving in that area or at that time of day.

even if Defendant had privileges, that the officers may have been given incorrect information by dispatch does not negate the fact that Officer Akers had the authority to order Defendant out of the vehicle.[6] When Defendant stood up, Officer Akers asked again if he had any guns. This time Defendant said yes.

### C. Probable Cause to Arrest Defendant

Because Defendant first told Officer Roberts that he did not have any guns, and then later admitted to Officer Akers that he had a gun in his pocket, Officer Akers testified that Defendant was arrested for improper handling of a firearm. The government argued that the officers had probable cause to effectuate Defendant's arrest on this basis because, pursuant to Ohio Revised Code Section 2923.16(E)(1), it is a criminal offense to carry a concealed weapon and fail to disclose the presence of the weapon to law enforcement officers when asked. Defendant does not contest the applicability of this Code Section. Instead, Defendant challenged the conclusion that he was not truthful in the first instance.

Defendant argued that Officer Roberts' question about firearms was limited to the glove box. Because there was no firearm in the glove box, he claimed he answered truthfully. In reviewing the body camera footage, however, the Court is not so persuaded. Officer Roberts did not ask if there was anything in *there* that he should be worried about. He asked if there was anything in *here* that could be a concern. The question asked referred to more than just the glove box, and it was reasonable for the officers to conclude that a negative response to this question was not truthful.[7]

---

[6] The window tint investigation was still ongoing.

[7] Officer Roberts' body camera footage provides additional support for his conclusion that Defendant was not truthful. The footage captures his left hand moving off screen in a direction seemingly towards the rear of Defendant's vehicle – and away from the glove box – while he is

Having found that the officers reasonably concluded that Defendant was not initially truthful about having a firearm, the Court concludes that the officers had probable cause to arrest Defendant for improper handling of a firearm.

### D. Search Incident to Arrest

Officer Akers testified that Defendant was searched incident to his arrest for improper handling of a firearm. The lawfulness of such a search is well recognized. *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (recognizing that, after arresting an individual, officers may search the arrestee's person); *Chimel v. California*, 395 U.S. 752, 762-63 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.").

This search yielded the firearm as well as clear plastic bags containing pills. (Gov't Ex. 2, 5:31:20.) Officer Akers testified that he observed two different types of pills. Defendant told the officers on scene that the pills were his "medicine" and later claimed that both types of pills were "ibuprofen." But Officer Sayers inspected the pills and notified the other officers that "the blue ones were oxy." (*Id*. at 5:34:53.)

---

asking if there are any guns in here. That Defendant may not have seen or appreciated that the gesture included the entirety of the vehicle is of no moment. In the probable cause analysis, it is what the officers reasonably perceived and concluded that controls. *Copeland*, 321 F.3d at 592.

### E. Probable Cause to Search Defendant's Vehicle[8]

The "automobile exception" permits a warrantless search of a vehicle "if the officers have probable cause to believe that the vehicle contains evidence of a crime." *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (quoting *United States v. Smith,* 510 F.3d 641, 647 (6th Cir. 2007)). Probable cause must be supported by reasonable grounds for belief given the totality of the present circumstances. *Smith*, 510 F.3d at 647.

The search may include all parts of a legitimately stopped vehicle, including the trunk, compartments, and containers. *California v. Acevedo*, 500 U.S. 565, 570 (1991) (recognizing *United States v. Ross*, 456 U.S. 798, 800 (1982), which held a "probing search of compartments and containers within the automobile" does not offend the Fourth Amendment "so long as the search is supported by probable cause"). While conducting a search under the automobile exception, officers may seize an object if its incriminating character is immediately apparent. *United States v. Hicks*, 190 F. Supp. 3d 733, 745 (S.D. Ohio 2016); *United States v. Matthews*, 422 F. Supp. 3d 1235, 1247 (W.D. Ky. 2019); *see also Texas v. Brown*, 460 U.S. 730, 738 (1983); *Galaviz*, 645 F.3d at 357.

During the search incident to arrest, the officers discovered oxycodone pills in separate clear plastic bags and a gun, both of which were on Defendant's person. They also witnessed Defendant make blatant misrepresentations about having a gun and the nature of the pills.

---

[8] There are recognized Fourth Amendment exceptions that may permit warrantless searches of vehicles. *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020). One is the "automobile exception," which requires probable cause that the vehicle contains evidence of a crime. *California v. Carney*, 471 U.S. 386, 392-93 (1985). Another is a search "incident to arrest" when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343 (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004)). The government has argued only the automobile exception.

Defendant also told the officers that he did not know who owned the gun or how he came to be in possession of it.

With all of these facts, the officers reasonably concluded that criminal activity was probably afoot and that the vehicle Defendant just exited probably contained contraband. *See, e.g.*, *Alexander*, 954 F.3d at 917 (holding that the combination of the presence of methamphetamine found on the defendant and visible money in his vehicle "would have established probable cause necessary to conduct a search of the vehicle pursuant to the automobile exception"); *United States v. Davis*, No. 2:22-CR-195, 2023 WL 2154688, at *6 (S.D. Ohio Feb. 22, 2023) ("[T]he strong aroma of marijuana coming from the car, in conjunction with the handgun in plain view and [the defendant's] unsuccessful escape attempt, triggered the automobile exception."); *United States v. Stewart*, 473 F.3d 1265, 1270 (10th Cir. 2007) (holding that the defendant's possession of a loaded firearm and a narcotics detection dog's indication that the defendant's vehicle contained drugs "gave rise to probable cause to search [the defendant's] Tahoe and its contents"); *Hicks*, 190 F. Supp. 3d at 744-45 (finding that sandwich bags, digital scale, and open container of beer in the officer's plain view inside the defendant's car combined with the fact that the defendant had previous history of possession drugs and firearms "provided sufficient probable cause to search Defendant's vehicle without a warrant under the automobile exception").

Even viewed in isolation, the fact that Defendant was found to have narcotics on him immediately after he stepped out of his vehicle authorized the search under the automobile exception. *United States v. Harris*, 578 F. Supp. 3d 930, 935-36 (E.D. Mich. 2022) ("[T]he officers had probable cause to search [the defendants'] car because of the suspected cocaine [] on [the defendant]" found during a search incident to arrest. ); *United States v. Guy*, 1 F. App'x 410,

413 (6th Cir. 2001) (finding that a crackpipe in the defendant's hands gave the officers probable cause believe that other contraband would be found in his car).

Defendant's violation of Ohio's criminal code for being untruthful about possessing a weapon also provided probable cause to search his car – especially after Defendant told the officers he did not know who owned the gun or how it came to be in his possession. *Cf. Galaviz*, 645 F.3d at 357 (holding gun in plain view inside car created probable cause to search vehicle); *United States v. Willis*, 37 F.3d 313, 316 (7th Cir. 1994) ("[B]ecause possession of a firearm in a school zone is a federal crime, [the officer] would have had probable cause, and thus a legal right, to search [the defendant's] car and seize the gun.").

And even if probable cause only related to the "oxy" Officer Sayers identified and that Defendant was not truthful about, the seizure of all contraband in the vehicle – including the additional firearm – was proper, as the incriminating character of it was immediately apparent. *Hicks*, 190 F. Supp. 3d at 744-45 (gun found in vehicle's glove box was legally seized while conducting an automobile exception search inside suspected narcotics trafficker's vehicle); *Matthews*, 422 F. Supp. 3d at 1247 (holding that officers could lawfully seize gun found during an automobile exception search justified because officers detected marijuana in car); *see also Brown*, 460 U.S. at 738 (recognizing that "requiring police to obtain a warrant once they obtained a first-hand perception of contraband, stolen property or incriminating evidence generally would be a needless inconvenience" (citations and quotations omitted)).

## F. Inevitable Discovery During the Inventory Search

The government alternatively argued that Defendant's motion to suppress should be denied because the officers would have inevitably discovered the contraband while conducting a lawful inventory search. (Doc. No. 19 at PageID 76-77.)

The inevitable discovery doctrine "allows unlawfully obtained evidence to be admitted at trial if the government can prove by preponderance that the evidence would have been acquired through lawful means." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir.1995) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "Proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001) (cleaned up). "The exception requires the court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Id.* (cleaned up).

The government asserted that the inevitable discovery doctrine applies because the officers would have inevitably conducted a lawful inventory search of Defendant's vehicle pursuant to LPD's inventory and tow policies. (*See* Doc. No. 19 at PageID 74-78.) This argument is well-taken.

A valid inventory search of a vehicle does not violate the Fourth Amendment. *United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007). The Sixth Circuit has cautioned that there "must be some set of guiding principles that govern the scope of inventory searches." *Alexander*, 954 F.3d at 916. Thus, while conducting an inventory search, officers must follow "standardized criteria" or "established routine" outlined by their department. *United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013) (quoting *Florida v. Wells,* 495 U.S. 1, 4 (1990)). This requirement protects against officers having unfettered discretion to use inventory searches as "a ruse for a general rummaging in order to discover incriminating evidence." *Wells,* 495 U.S. at 4. In determining whether the inventory search exception applies, courts "must consider whether the evidence establishes that the police acted in bad faith or for the sole purpose of

investigation' in conducting an inventory search." *Hockenberry*, 730 F.3d at 659 (quoting *United States v. Vite–Espinoza*, 342 F.3d 462, 470 (6th Cir. 2003)).

The LPD Policy Manual states that "[w]henever a person in charge or in control of a vehicle is arrested, it is the policy of this department to . . . tow[] the arrestee's vehicle." (Doc. No. 19-1 at PageID 81.) The following section informs that "[a]ll property in a stored or impounded vehicle shall be inventoried and listed on the vehicle inventory report." (*Id.*) This section also sets forth guidelines on how and for what purpose the inventory search is to be conducted, including inventorying all items found in the "trunk and compartments or containers." (*Id.* at PageID 81-82.) While the LPD Policy Manual outlines when officers have discretion, notable are that (1) discretion is not authorized *unless* the vehicle can be lawfully parked, and (2) the "vehicle was not used to further the offense for which the occupant was arrested or is not subject to forfeiture proceedings." (*Id.* at PageID 81.)

Defendant did not contend that LPD lacked a set of clear "guiding principles" for inventory searches. Nor did he dispute Officer Akers determination that LPD's tow policy applied because Defendant's car was parked in someone else's private driveway. Instead, Defendant seemed to suggest that the officers' inventory search was done in bad faith or solely for an investigative purpose because his mother could have taken possession of the car.

At oral argument, Defendant asserted that his mother owned the vehicle. And even though she arrived on scene late in the investigation, she could have taken the car in lieu of a tow. To Defendant, this shows that there was no legitimate basis to tow and inventory the vehicle. This argument is not persuasive for three reasons. First, Officer Ackers credibly testified that he had already called for the tow truck before Defendant's mother arrived. As he explained, his supervisors at LPD had previously instructed patrol officers that they could not

cancel a tow after was one was called.[9]  Second, releasing a vehicle to a family member is not a listed exception to LPD's policy of towing an arrestee's vehicle.  (Doc. No. 19-1 at PageID 81.)  And third, the policy does not support releasing a vehicle when, as is the case here, the vehicle was used to further the proceedings *or* could be subject to forfeiture, a challenge Defendant did not raise.  There is no evidence that the officers had the discretion Defendant asserts and, even if they did, that their declining to exercise that discretion was in bad faith.

Under *United States v. Kimes*, 246 F.3d 800 (6th Cir. 2001), even if Defendant had shown that the officers could have released the vehicle to his mother, the officer's decision to still tow the vehicle would not have prohibited the government from conducting a lawful inventory search.  *Id.* at 805.  In *Kimes*, the officer searched a vehicle parked on Veterans Affairs' (V.A.) property.  *Id.* at 804-05.  The court held that the evidence seized during the search was admissible – regardless of whether the actual search was legal – because the V.A.'s policy was to remove all parked vehicles not belonging to patients or visitors and conduct an inventory search before the removal of a vehicle.  *Id.*  The government demonstrated that these policies would have applied to the defendant's vehicle and led to the discovery of the seized evidence, so the court held that the evidence was admissible under the inevitable discovery doctrine.  *Id.* at 804.

Notably, the *Kimes* court rejected the defendant's argument that the officer could not have conducted a proper search under the inventory exception because the officer did not think to call the defendant's wife to have her pick up the vehicle.  *Id.* at 805.  The court rejected this argument despite finding that it was V.A. policy to "sometimes" allow a vehicle subject to

---

[9] Officer Ackers acknowledged that other departments may allow this practice, and that one of his prior employers permitted him to release vehicles to another authorized driver in lieu of towing.

removal to be picked up by a friend or relation of the driver. *Id.* Defendant makes the same suggestion as the defendant in *Kimes,* and for the reasons stated this Court is similarly unpersuaded.

The government has demonstrated by a preponderance of the evidence that the items seized from Defendant's vehicle would have inevitably been discovered pursuant to LPD's policy. (Doc. No. 19-1 at PageID 81-82.) Thus, even if the search was not lawful under the automobile exception, the inevitable discovery doctrine applies, and no Fourth Amendment violation occurred.

### III. Conclusion

For the reasons stated herein, Defendant's Motion to Suppress is DENIED.

**IT IS SO ORDERED.**

**Date**: April 21, 2023

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE